Filed 8/10/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| PACIFIC MERCHANT SHIPPING ASSOCIATION, et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>GAVIN C. NEWSOM, as Governor, etc., et al.,<br><br>  Defendants and Respondents.<br><br>OAKLAND ATHLETICS INVESTMENT GROUP, LLC,<br><br>  Real Party in Interest and Respondent. | A162001<br><br>(Alameda County Super. Ct. No. RG20058975) |

This appeal concerns special legislation enacted to facilitate the construction of a new baseball park and mixed-use development project at the Howard Terminal site in the City of Oakland (Howard Terminal Project). Under section 21168.6.7 of the Public Resources Code,[1] the Howard Terminal Project is eligible to qualify for expedited administrative and judicial review under the California Environmental Quality Act (CEQA) (§21000 et seq.) if

---

[1] All statutory references are to the Public Resources Code unless otherwise specified.

the Governor of the State of California certifies that the project meets an enumerated set of job-creation, environmental protection, sustainable housing, and transit and transportation infrastructure conditions.

In March 2020, Pacific Merchant Shipping Association, Harbor Trucking Association, California Trucking Association, and Schnitzer Steel Industries, Inc. (collectively, petitioners) filed the instant action challenging the authority of Governor Gavin Newsom to certify the project for streamlined environmental review. Specifically, petitioners claimed that, under section 21168.6.7, the Governor's authority to certify the project had expired on January 1, 2020. The Governor, the City of Oakland, and real party in interest Oakland Athletics Investment Group, LLC (Real Party and collectively, respondents) filed motions for judgment on the pleadings, arguing that section 21168.6.7 contains no deadline for certification by the Governor. The trial court sided with respondents' reading of the statute and upheld the Governor's ongoing certification authority. On February 11, 2021, the Governor certified the Howard Terminal Project for expedited CEQA review.[2] We now conclude that section 21168.6.7 does not impose on the Governor a deadline by which to certify the Howard Terminal Project and therefore affirm the judgment below.

---

[2] By motion filed on March 10, 2021, petitioners requested judicial notice of four documents, including the Governor's certification of the Howard Terminal Project (Exhibit A) and portions of the draft environmental impact report (EIR) and related environmental materials for the project (Exhibits B through D). We deferred resolution of the request until consideration of the merits of this appeal by order dated March 12, 2021. We now grant the request with respect to Exhibit A. (Evid. Code, §§ 452, subd. (c), 459, subd. (a).) We deny the remainder of petitioner's judicial notice request as unnecessary to our decision.

## I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Judicial Review Under CEQA

### i. Standard CEQA Review

" 'CEQA reflects the California state policy that "the long-term protection of the environment, consistent with the provision of a decent home and suitable living environment for every Californian, shall be the guiding criterion in public decisions." (§ 21001, subd. (d).)' " (*Communities for a Better Environment v. Bay Area Air Quality Management Dist.* (2016) 1 Cal.App.5th 715, 721.) To this end, CEQA requires that a lead agency prepare an EIR for any project that may have a significant and adverse physical effect on the environment. (§ 21100, subd. (a).) The EIR "assesses the potential environmental impacts of the project as proposed, sets forth any feasible, less harmful alternatives to the project, and identifies any feasible mitigation measures. (§§ 21000 et seq., 21151 et seq.) The agency may not thereafter approve the project as proposed if there are feasible alternatives or mitigation measures that would avoid or substantially lessen the adverse environmental effects. (§ 21002.)" (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 498 (*Stockton Citizens*).)

"CEQA's purpose to ensure extremely prompt resolution of lawsuits claiming noncompliance . . . is evidenced throughout the statute's procedural scheme." (*Stockton Citizens*, *supra*, 48 Cal.4th at p. 500.) For example, "CEQA provides unusually short statutes of limitations on filing court challenges to the approval of projects." (Cal. Code Regs., tit 14, § 15000 et seq. (CEQA Guidelines), § 15112, subd. (a).) In addition, lawsuits claiming noncompliance with CEQA "have calendar preference; more populous counties must designate one or more judges to develop CEQA expertise so as to permit prompt disposition of CEQA claims; and expedited briefing and

3

hearing schedules are required.  (§§ 21167.1, 21167.4.)" (*Stockton Citizens*, at p. 500.)  The purpose behind these provisions is to ensure that CEQA challenges are diligently prosecuted and resolved.  (*Ibid.*)

These requirements, however, do not always lead to prompt resolution of CEQA court challenges.  For example, while actions or proceedings alleging CEQA noncompliance must be given "preference over all other civil actions" at both the trial court and appellate level, appellate courts are only required to regulate briefing "so that, to the extent feasible, the court shall commence hearings on an appeal within one year of the date of the filing of the appeal." (§ 21167.1, subd. (a).)  Thus, CEQA generally contains no deadline for resolving these matters.

ii. *Expedited CEQA Review Under Assembly Bill 900*

In 2011, the Legislature recognized that there were many large, privately financed projects under consideration "in various regions of the state that would replace old and outmoded facilities with new job-creating facilities to meet those regions' needs while also establishing new, cutting-edge environmental benefits to those regions."  (Assem. Bill No. 900 (2011-2012 Reg. Sess.) (Assembly Bill 900) §1, former §21178, subds. (a) & (d).)  Prompted by high unemployment, the Legislature enacted the Jobs and Economic Improvement Through Environmental Leadership Act of 2011.  The purpose of the legislation was "to provide unique and unprecedented streamlining benefits" under CEQA for specified projects "for a limited period of time to put people to work as soon as possible."  (*Id.*, former § 21178, subd. (i).)

Specifically, Assembly Bill 900 established fast-track administrative and judicial review procedures for an "environmental leadership development project" that met certain conditions, including the creation of high-wage,

4

high-skilled jobs, no net additional emission of greenhouse gases, and the payment of certain costs by the project applicant. (Former §§ 21178-21186.) Under this legislation, the Governor[3] was required to certify that the project met these statutory criteria to qualify for fast-track status. Once certified, Assembly Bill 900 established that certain CEQA court challenges must "be resolved, to the extent feasible, within 270 days." (Former § 21185.) The legislation directed the judicial council to adopt a rule of court to effectuate this mandate. (*Ibid.*; see Cal. Rules of Court, rules 3.2220-3.2227.)

A leadership project included "residential, retail, commercial, sports, cultural, entertainment, or recreational" infill projects certified as Leadership in Energy and Environmental Design (LEED) gold or better by the United States Building Council, offering 15 percent greater transportation efficiency than comparable projects, and meeting certain requirements for commercial and organic waste recycling. (Former §§ 21180, subd. (b) & 21183, subd. (d).) The Governor was authorized to "issue guidelines regarding application and certification of projects," and any such guidelines were not subject to the rulemaking provisions of the Administrative Procedures Act (APA). (Former § 21184, subd. (c).) Other than the express provisions set forth in the statute, nothing in Assembly Bill 900 was intended to "affect[] the duty of any party" to comply with CEQA. (Former § 21189.)

As originally enacted, Assembly Bill 900 contained no deadline for the Governor's certification of a leadership project. The statute provided a deadline for a lead agency to approve the project by June 1, 2014, and the legislation itself was set to expire on January 1, 2015, unless "a later enacted

---

[3] For purposes of this opinion, the term "Governor" encompasses all past and future governors of the state of California as well as Governor Newsom, as the context requires.

5

statute extend[ed] or repeal[ed] that date." (Assem. Bill 900, § 1, former §§ 21189.1 & 21189.3.) In 2014, Assembly Bill 900 was amended to require certification by the Governor and project approval by January 1, 2016. The legislation's sunset date was extended to January 1, 2017. (Assem. Bill No. 743 (2013-2014 Reg. Sess.), §§ 8, 14, & 15 (Assembly Bill 743), former §§ 21181, 21189.1, 21189.3.) These statutory deadlines were extended several more times. (Sen. Bill No. 734 (2015-2016 Reg. Sess.), §§ 2, 5 & 6, former §§ 21181, 21189.1 & 21189.3; Assem. Bill No. 246 (2017-2018 Reg. Sess.), §§ 2, 6 & 7, former §§ 21181, 21189.1 & 21189.3.) In its final iteration—the version relevant to the instant proceedings—Assembly Bill 900 required the Governor to certify a leadership project by January 1, 2020 and the lead agency to approve the project by the sunset date, January 1, 2021. (Assem. Bill No. 246 (2017-2018 Reg. Sess.), §§ 2, 6 & 7, former §§ 21181, 21189.1 & 21189.3.)

The Assembly Bill 900 Guidelines (Guidelines) adopted by the Governor also went through several iterations. First promulgated in 2012 through the Office of Planning and Research (OPR), the Guidelines provided logistical details for the submission and processing of applications for certification, information regarding public review and comment, and descriptions of various steps in the approval process. The Guidelines also described the substantive information that was required for a project to qualify for certification under Assembly Bill 900. In 2015 and 2018, the Guidelines were amended to reflect substantive changes made through amendment of Assembly Bill 900. The 2018 amendments also incorporated then-applicable Assembly Bill 900 deadlines, stating: "The Governor must certify the project prior to January 1, 2020. The certification will expire and is no longer valid if the lead agency fails to approve the certified project

6

before January 1, 2021."  The Guidelines were thereafter amended three times in 2019 and once in April 2020.  With the exception of two amendments discussed further below, these amendments related to procedural matters during the certification process.

        *iii.*    *Expedited CEQA Review Under Single Project Legislation*

Assembly Bill 900 has not been the only statutory scheme enacted to provide expedited judicial review under CEQA.  Several special statutes have been legislated to streamline CEQA review for individual projects.  For example, on the same day Assembly Bill 900 was enacted, the Legislature passed Senate Bill No. 292 for the proposed development of a football stadium and multi-purpose event center in downtown Los Angeles. (Sen. Bill No. 292 (2011-2012 Reg. Sess.) §1, subds. (e) & (g).)

The Legislature later enacted three other special statutes, including the law at issue in this appeal—Assembly Bill No. 734—to fast track judicial review of CEQA challenges to these sports stadium projects.  (Assem. Bill 743, § 2, subds. (c) & (e) [multipurpose event center for Sacramento Kings]; Assem. Bill No. 987 (2017-2018 Reg. Sess.) (Assembly Bill 987) [basketball arena for Los Angeles Clippers in City of Inglewood (Inglewood Project)]; Assem. Bill No. 734 (2017-2018 Reg. Sess.) (Assembly Bill 734) [baseball stadium and mixed-use development for Oakland Athletics at Howard Terminal in City of Oakland].)  Assembly Bill 743, for example, incorporated many of the environmental mandates found in Assembly Bill 900, but did not require certification by the Governor and set no deadline for project approval or date for repeal.  (Assem. Bill 743, § 7.)  This legislation was justified as a special statute "because of the unique need for the development of an entertainment and sports center project in the City of Sacramento in an expeditious manner."  (*Id.*, § 16.)

## B. The Howard Terminal Project

In 2018, faced with the "impending loss of the Raiders to Las Vegas and the Golden State Warriors to San Francisco," the Legislature sought to facilitate "a new baseball park" at the Howard Terminal site in the City of Oakland. (Assem. Com. on Natural Resources, analysis of Assem. Bill No. 734 (2017-2018 Reg. Sess.), as amended on August 28, 2018, p. 4 (Natural Resources Analysis); Assem. Bill 734, §1, subd. (c).)[4] The Oakland Athletics have called the City of Oakland home for the last 50 years, but the Oakland Coliseum was aging and in need of replacement. According to the author of the bill, it was "critically important to the [City of Oakland] and entire East Bay region to retain a professional sports team." (Natural Resources Analysis, at p. 4; Assem. Bill 734, § 1, subd. (b).) The Howard Terminal Project would create many high-wage, highly skilled jobs and present "an unprecedented opportunity to invest in new and improved transit and transportation infrastructure and implement sustainability measures

---

[4] By motion filed on April 16, 2021, respondents requested judicial notice of 19 documents, including portions of the legislative history for both Assembly Bills 734 and 987 (Exhibits A through F) and various documents relevant to the certification of the Howard Terminal Project and subsequent draft EIR (Exhibits G through S). We deferred resolution of the request until consideration of the merits of this appeal by order dated April 19, 2021. We now grant the request with respect to Exhibits A through F and Exhibit R. (Evid. Code, §§ 452, subd. (c), 459, subd. (a); see *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 31-37.) We deny the remainder of respondent's judicial notice request as unnecessary to our decision. On our own motion, we take judicial notice of the remainder of the legislative history for Assembly Bills 734 and 987 and the entire legislative history for Senate Bill 7, all as compiled by the California Legislative Information website. (*Ibid.*; see also https://leginfo.legislature.ca.gov/ faces/codes.xhtml.) We deny the parties' July 9, 2021 requests for judicial notice as either moot or unnecessary to our decision.

8

designed to improve air quality and mitigate the emissions of greenhouse gases resulting from the project." (Assem. Bill 734, § 1, subds. (e) & (f).)

Assembly Bill 734 is special legislation applicable solely to the Howard Terminal Project. (Assem. Bill 734, §§ 1-4 [effective Jan. 2, 2019].) According to the Legislature, a special statute was necessary "because of the unique need for the development of a sports and mixed-use project in the City of Oakland in an expeditious manner." (*Id.*, § 3.) The Howard Terminal Project is comprised of the following components: (1) "[a] baseball park that will become the new home to the Oakland Athletics and adjacent residential, retail, commercial, cultural, entertainment, or recreational uses developed by the Oakland Athletics"; (2) "[a]ssociated public spaces"; and (3) "[f]acilities and infrastructure for ingress, egress, and use of the baseball park and mixed-use development." (§ 21168.6.7, subd. (a)(3), (a)(3)(B) & (C).)

Pursuant to section 21168.6.7, the baseball park and any non-residential construction in the Howard Terminal Project must achieve LEED gold certification, and residential construction must achieve either LEED gold certification or "the comparable GreenPoint rating, including meeting sustainability standards for access to quality transit." (§ 21168.6.7, subd. (a)(3)(A)(i).) The project must also achieve greenhouse gas neutrality as determined by the California Air Quality Board (CARB), reduce by 20 percent the collective vehicle trips by "attendees, employees, visitors, and customers" as compared to operations without a traffic management program, be located in a specified priority development area, and offer a "comprehensive package of community benefits" such as job training programs, open space, and affordable housing. (*Id.*, subd. (a)(3)(A)(ii-v).)

Section 21168.6.7 requires certification by the Governor that the Howard Terminal Project meets all the above-described criteria, and also

9

creates high-wage, highly skilled jobs, requires prevailing wages, complies with the City's bird safety measures, complies with statutory commercial and organic waste recycling mandates, requires the applicant to pay court costs and record preparation costs, and requires a binding agreement with a lead agency to monitor mitigation and environmental measures. (§ 21168.6.7, subd. (d).) The Guidelines apply to the "implementation" of section 21168.6.7 "to the extent those guidelines are applicable and do not conflict with specific requirements" of the special statute. (*Id.*, subd. (e)(2).) Finally, if the Howard Terminal Project is certified by the Governor, any court action or proceeding brought to challenge the lead agency's adoption of the EIR or the granting of any project approvals must be resolved within 270 days to the extent feasible. (*Id.*, subd. (c)(3).)

In parallel with the Legislature's consideration of Assembly Bill 734, the Legislature concurrently enacted Assembly Bill 987, special legislation providing the same type of streamlined CEQA review for the Inglewood Project. (Assem. Bill 987 , §§ 1-3.) Assembly Bill 987 adopts similar requirements with respect to LEED certification, trip reduction, job creation, greenhouse gas neutrality, recycling, enforcement of environmental and mitigation measures, and allocation of costs. (§ 21168.6.8, subds. (a)(3) & (b).) The legislation also requires certification by the Governor and incorporates the Guidelines "to the extent the guidelines are applicable and do not conflict with specific requirements" of the special statute. (*Id.*, subds. (c).)

Assembly Bill 987 differs from Assembly Bill 734 in two notable respects. First, Assembly Bill 987 states that an EIR must be certified by the lead agency prior to January 1, 2025, or the statute will be repealed as of that date. (§ 21168.6.8, subd. (i)(1).) Conversely, Assembly Bill 734 contains no

10

express deadlines for certification by the Governor or project approval by a lead agency. (See generally § 21168.6.7). Second, Assembly Bill 987 "encourage[s]" CARB "to make its determination no later than 120 calendar days after receiving an application for review of the methodology and calculations of the [Inglewood Project's] greenhouse gas emissions" (§ 21167.6.8, subd. (b)(3)), while no such expedited review or encouragement of CARB appears in Assembly Bill 734 (see generally § 21167.6.8).

On November 20, 2018, shortly after the Governor signed Assembly Bill 734 into law, the City of Oakland issued a notice of preparation of a draft EIR for the Howard Terminal Project. In January 2019, the Governor updated the Guidelines to state that they applied to projects requesting streamlined judicial review under Assembly Bills 734 and 987 "to the extent the Guidelines are applicable and do not conflict with the language contained within those statutes." In March 2019, Real Party submitted an application to the Governor for certification of the project under Assembly Bill 734. However, unlike the Inglewood Project, which was certified by the Governor prior to January 1, 2020, the Howard Terminal Project was still in the certification process during 2020. In particular, CARB was still evaluating whether the Howard Terminal Project would meet its greenhouse gas reduction targets under Assembly Bill 734. It was not until August 25, 2020, over 16 months after Real Party submitted its application, that CARB finally issued its determination that the Howard Terminal Project "will meet the [greenhouse gas] requirements provided by AB 734."

## C. The Litigation

Petitioners filed the instant action on March 16, 2020, seeking both a declaration that the Governor's authority to certify the Howard Terminal Project under Assembly Bill 734 had expired as a matter of law on January 1,

11

2020, and a writ of mandate and/or injunction barring the Governor from certifying the project under that statute.[5]  Soon thereafter, OPR amended the Guidelines to state expressly that the timelines in the Guidelines "do not apply to projects undertaken pursuant to AB 734 and AB 987."  (Guidelines, § 8, as amended Apr. 2020.)  Petitioners filed an amended petition and complaint on May 15, 2020, challenging the authority of OPR to "revive" the Governor's expired certification power under Assembly Bill 734.

In August 2020, the Governor and Real Party filed motions for judgment on peremptory writ/judgment on the pleadings.  The City of Oakland joined in both motions, which argued that the Legislature never intended to incorporate the deadlines from the Guidelines into Assembly Bill 734 and that, regardless, the deadlines had been eliminated by the Governor's April 2020 amendment.  Petitioners disagreed, claiming that Assembly Bill 734 expressly incorporated the deadlines set forth within the Guidelines, the legislative history supported their view of the statute, and OPR's subsequent amendment of the Guidelines was without legal effect.

The superior court issued a tentative statement of decision on November 20, 2020, concluding that the Guidelines "appear to indicate that the Governor's January 1, 2020 deadline to certify projects applies to the [Howard Terminal Project]."  The court requested supplemental briefing on two issues, only one of which is relevant here.  It queried:  Is there "clear evidence that the [L]egislature intended that the Governor's office could change any deadlines provided in the guidelines for AB 900, including after those deadlines had already passed, and where specifically in the legislative

---

[5] Petitioners also alleged that Assembly Bill 734 was a special statute which violated article IV, section 16 of the California Constitution.  As this claim was voluntarily dismissed with prejudice by petitioners in February 2021, we do not discuss it further.

history already submitted by the parties would this evidence be found"? In supplemental briefing filed in response to this request, the Governor argued for the first time that, as of its January 1, 2021 sunset date, Assembly Bill 900—including the Guidelines it authorized—would be repealed, leaving the Governor free to certify the Howard Terminal Project because there would be nothing left to incorporate into Assembly Bill 734, and the special statute, itself, contained no deadlines.

At the January 14, 2021, hearing on the motions, the court focused the discussion on the new argument raised by the Governor. The court considered the practical consequences of the differing interpretations of the statutory provision at issue, subdivision (e)(2) of section 21168.6.7. Petitioners argued that because Assembly Bill 734 had incorporated the deadline for certification by the Governor within the Guidelines, the legal effect of the Governor's failure to certify before the January 1, 2020 deadline was that Assembly Bill 734 was essentially a dead letter. The trial court questioned that construction, given that Assembly Bill 734 itself has no sunset provision and remained in effect even as Assembly Bill 900 had been repealed by its own terms. An alternative interpretation, which the trial court described as "unusual and illogical," was posited that the Governor had missed his opportunity to certify the Howard Terminal Project before January 1, 2020 pursuant to the Guidelines, but had regained his authority to certify the project on or after January 1, 2021 when Assembly Bill 900 and the Guidelines expired and were no longer applicable to the implementation of Assembly Bill 734.

After taking the matter under submission, the court reversed its tentative decision by order dated January 28, 2021, granting the parties' requests for judicial notice, granting the Governor's and Real Party's motions

13

with respect to the certification issue, and dismissing the related cause of action.[6] The trial court gave multiple reasons for its determination. Noting that the Guidelines applied to the implementation of Assembly Bill 734 only "to the extent those guidelines are applicable and do not conflict with specific requirements" of that statute (§ 21168.6.7, subd. (e)(2)), the court concluded that the certification deadline in the Guidelines conflicted with Assembly Bill 734 because it has no deadlines. The trial court also accepted that the Governor had the power to amend the Guidelines to clarify that their certification deadline did not apply to Assembly Bill 734. Finally, the court noted that Assembly Bill 900 was repealed effective January 1, 2020 and therefore any deadlines associated with that law no longer had any force or effect. Assembly Bill 734, on the other hand, had not been repealed, and "it would be a perverse outcome if the Howard Terminal Project could not advance pursuant to a valid and operable statute (AB 734) because that statute includes a reference to the potential application of the guidelines for another statute (AB 900) that is no longer in effect."

This appeal followed. On February 11, 2021, the Governor certified the Howard Terminal Project for streamlined environmental review pursuant to Assembly Bill 734. On February 16, 2021, appellants filed a motion for calendar preference and expedited briefing schedule on appeal. Respondents concurred with the request. By order dated February 25, 2021, we granted the request for calendar preference and set an expedited briefing schedule.

More recently, the Legislature re-enacted Assembly Bill 900 through urgency legislation made effective May 20, 2021. (Stats. 2021, ch. 19, §§ 1-4 (Senate Bill 7).) Pursuant to Senate Bill 7, eligible projects must be certified

---

[6] As mentioned above, the other cause of action, related to the constitutional claim, was subsequently dismissed. (*Ante,* fn. 5.)

14

by the Governor before January 1, 2024.  (§ 21181.)  Project approval must occur before January 1, 2025, and the legislation sunsets on January 1, 2026.  (§§ 21189.1 & 21189.3)  As before, the Governor must certify the project to qualify for CEQA fast-track status and is authorized to issue guidelines outside of the rulemaking provisions of the APA.  (§ 21184, subd. (c).)  Having asked for and received supplemental briefing by the parties regarding the import of Senate Bill 7, if any, on these proceedings, this matter is now before us for decision.

## II. DISCUSSION

### A.  Analytical Framework and Standard of Review

The sole question we must determine in this appeal is whether the Governor's power to certify the Howard Terminal Project for expedited CEQA review expired on January 1, 2020, because subdivision (e)(2) of section 21168.6.7 incorporated the certification deadline from the Guidelines into Assembly Bill 734.  Because we conclude that Assembly Bill 734 did not impose on the Governor a deadline by which to certify the Howard Terminal Project, we do not reach the alternative arguments presented in the parties' briefs.

" 'On appeal [from an order granting or denying mandamus relief], we are not bound by any legal interpretation made by . . . the trial court.  Instead, we make an independent review of any questions of law necessary to the resolution of this matter on appeal.  [Citations.]  Statutory interpretation is a clear question of law for our determination anew on appeal.' " (*Daugherty v. City and County of San Francisco* (2018) 24 Cal.App.5th 928, 944; *Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1077; see also *Abatti v. Imperial Irrigation Dist.* (2012) 205 Cal.App.4th 650, 668 [questions of law in cases arising under CEQA are reviewed de novo].)

Moreover, "[a] motion for judgment on the pleadings is equivalent to a demurrer and is governed by the same de novo standard of review." (*Adams v. Bank of America, N.A.* (2020) 51 Cal.App.5th 666, 670.) We may therefore affirm if there is any basis for upholding the trial court's decision, "whether or not the trial court relied on proper grounds or the defendant asserted a proper ground in the trial court proceedings." (*Martin v. Bridgeport Community Assn., Inc.* (2009) 173 Cal.App.4th 1024, 1031.)

" 'The fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' " (*Upland Police Officers Assn. v. City of Upland* (2003) 111 Cal.App.4th 1294, 1303 (*Upland*); see also *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387.) "Because the statutory language is generally the most reliable indicator of legislative intent, we first examine the words themselves, giving them their usual and ordinary meaning and construing them in context." (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 268, superseded by statute on other grounds as stated in *Bernard v. City of Oakland* (2012) 202 Cal.App.4th 1553, 1561 at fn. 5.) "The statute's plain meaning controls the court's interpretation unless its words are ambiguous." (*Green v. State of California* (2007) 42 Cal.4th 254, 260.)

" If the words in the statute do not, by themselves, provide a reliable indicator of legislative intent, '[s]tatutory ambiguities often may be resolved by examining the context in which the language appears and adopting the construction which best serves to harmonize the statute internally and with related statutes.' " (*People v. Arias* (2008) 45 Cal.4th 169, 177.) Moreover, " 'statutes must be construed so as to give a reasonable and common-sense construction consistent with the apparent purpose and intention of the lawmakers—a construction that is practical rather than technical, and will

16

lead to wise policy rather than mischief or absurdity. [Citation.] In approaching this task, the courts may consider the consequences which might flow from a particular interpretation and must construe the statute with a view to promoting rather than defeating its general purpose and the policy behind it.' " (*Upland, supra*, 111 Cal.App.4th at p. 1303.) When " 'the language permits more than one reasonable interpretation, . . . the court looks "to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' " (*S.B. Beach Properties v. Berti* (2006) 39 Cal.4th 374, 379 (*Berti*).) Ultimately, " '[i]f a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed.' " (*People v. Cornett* (2012) 53 Cal.4th 1261, 1271.)

## B. The Statutory Text Does Not Resolve The Question

Subdivision (e)(2) of section 21168.6.7 provides as follows: "The guidelines issued pursuant to Chapter 6.5 (commencing with Section 21178) apply to the implementation of this section, *to the extent those guidelines are applicable and do not conflict with specific requirements of this section.*" (Italics added.) Both sides contend that the plain language of section 21168.6.7 supports their construction of the statute.

According to petitioners, Assembly Bill 734 incorporates the Guidelines—including their deadlines—if the Guideline provisions are applicable and not in conflict with "specific requirements" of Assembly Bill 734. When the statute was signed into law by the Governor in September 2018, the Guidelines expressly stated that "[t]he Governor must certify the

17

project prior to January 1, 2020."[7]  Petitioners argue that "applicable" means "capable of being applied."  (Oxford English Dictionary (compact ed. 2013) Vol. I, p. 409.)  Since the certification deadline was capable of being applied to the Howard Terminal Project and did not conflict with any "specific requirements" under section 21168.6.7 (which contains no deadlines), the January 1, 2020 deadline for certification of the project by the Governor was a clear mandate.

Respondents, in contrast, begin and end with the fact that Assembly Bill 734 contains no deadlines, for certification by the Governor or otherwise. They assert that the Guidelines cannot *implement* Assembly Bill 734 by imposing a deadline from a different statute.  Stated another way, the Legislature's omission of any deadline from the text of section 21168.6.7 was a clear and deliberate choice.  Had the Legislature intended for Assembly Bill 734 to include a deadline, it would have expressly specified a deadline in the statute, as it has done with other single project legislation such as Assembly Bill 987 (see § 21168.6.8, subd. (i)(1)), and with environmental leadership development project legislation under the Assembly Bill 900 framework. (Sen. Bill 743, §§8, 15; Sen. Bill 734, §§ 2, 5, 6; Assem. Bill 246, §§ 2, 6, 7.)

The parties' arguments reveal that the statutory text does not provide a clear answer to this interpretive question.  Petitioners' definition of "applicable" proves too much because whether a deadline *can* be applied does not answer the question whether the Legislature *intended* to have one apply to the Howard Terminal Project.  A more apt definition of "applicable" is whether a certification deadline is "fit, suitable" or "appropriate" under the

---

[7] Petitioners also point out that shortly after Assembly Bill 734 went into effect, the Guidelines were amended by the Governor to confirm that "[t]hese Guidelines apply to projects requesting certification for streamlined judicial review under Assembly Bill 734."  (Italics omitted.)

circumstances. (Merriam-Webster's Collegiate Dict. (11th ed. 2014) p. 60.).
Under this definition, we find it doubtful that the Legislature intended to
incorporate any deadlines into the project.

Petitioners' argument would require this Court to conclude that the
Legislature enacted special legislation to facilitate the construction of a
baseball park and mixed-use development project in the City of Oakland with
numerous complicated conditions for certification by the Governor. But
rather than specify that the Governor would be required to certify the project
within one year of the law's effective date, January 1, 2019, the Legislature
instead embedded this vital deadline within an oblique reference to
guidelines promulgated under a different expiring statute. Given the
Legislature's willingness to enact specific deadlines in other, similar statutes,
the absence of any express deadline here suggests that the Legislature did
not intend to constrain the Governor's ability to certify the project in the
manner petitioners suggest. Nevertheless, the Legislature did not make its
intentions clear, for example by stating that the Howard Terminal Project
was not subject to any certification or project approval deadlines. We must
therefore look to available extrinsic aids, beginning with the legislative
history of Assembly Bill 734, to discern the Legislature's intent.

## C. Legislative History of Assembly Bill 734

Under amendments adopted on June 4, 2018,[8] Assembly Bill 734
proposed the addition of section 21168.6.7 to allow fast-track CEQA
procedures for the Howard Terminal Project if the project was certified by the

---

[8] As originally introduced by Assembly Member Bonta in 2017,
Assembly Bill 734 proposed a change to the law authorizing infrastructure
financing districts that is not relevant here. This language was later
removed from the legislation. (Assem. Bill 734, as introduced Feb. 15, 2017,
and amended March 23, 2017, and June 4, 2018.)

19

Governor to meet several conditions, including the creation of high-wage, highly skilled jobs that paid prevailing wages and the payment of certain costs by the project applicant. (Assem. Bill 734, as amended June 4, 2018.) This version of the bill did not reference Assembly Bill 900 and did not contain any greenhouse gas emission reduction targets. The bill provided that any legal challenge to the project, including any appeals, must be resolved within 270 days "to the extent feasible," and it limited the trial court's authority to stay or enjoin the construction or operation of the project. The bill also provided that the Governor could "issue guidelines regarding application for and certification of the project." (*Id.* [proposed § 21168.6.7, subds. (a)(3)(A)(i), (b), (d)(2), (g)(1)(A)].)

An analysis by the Senate Committee on Environmental Quality was generally critical of the proposed legislation. The analysis summarized Assembly Bill 900, described certain unique CEQA statutes for specific projects, and listed prior stadium projects that had either been subject to full CEQA review, a special statute, or Assembly Bill 900. (Sen. Com. on Environmental Quality, analysis of Assem. Bill No. 734 (2017-2018 Reg. Sess.), as amended on June 4, 2018 (Environmental Quality Analysis) at pp. 1-11.) It emphasized that the bill did not guarantee that all legal challenges to the project would be completed within the proposed 270-day timeframe. (*Id.* at pp. 11-12.) Moreover, it observed that the proposed bill was much weaker than Assembly Bill 900, failing to require greenhouse gas neutrality or LEED gold certification while "dramatically" limiting judicial review of CEQA compliance. (Environmental Quality Analysis, at pp. 13-14.) Explaining that the deadlines for environmental leadership development projects under Assembly Bill No. 900 had been extended to January 1, 2020 for project certification and January 1, 2021 for project approval, the analysis

20

suggested that the Committee might wish to consider whether the City of Oakland should apply under the existing Assembly Bill 900 process for the Howard Terminal Project rather than pursue special legislation. (Environmental Quality Analysis at pp. 13-14.)

The Senate Judiciary Committee analyzed the June 4th version of the bill as well as certain proposed amendments that had been reached between the author and the Senate Committee on Environmental Quality but had not yet been incorporated into the draft legislation. (Sen. Com. On Judiciary, analysis of Assem. Bill No. 734 (2017-2018 Reg. Sess.) as amended on June 4, 2018, p. 1 (Sen. Judiciary Com. Analysis).) Specifically, the author had committed "to more closely align the bill with the AB 900 standards for leadership project designation" through the following amendments: (1) requiring that the baseball stadium and all commercial buildings in the project achieve at least LEED gold ratings and all residential buildings achieve at least LEED silver ratings; (2) specifying that the ballpark would achieve net zero greenhouse gas emissions; and (3) deleting certain language limiting judicial action with respect to the construction and operation of the project. (*Id.* at pp. 8-9.) In addition, the author had committed to continuing to work on further amendments to (1) "[m]ore closely mirror AB 900 greenhouse gas emission reduction targets," as modified to reflect the City's unique situation, and (2) "[i]ncorporate certification by the Governor as specified in AB 900." (*Id.* at p. 9.)[9] After these agreements were made, the

_____

[9] At oral argument in this matter, counsel for petitioners repeatedly cited this language as evidencing the author's agreement to incorporate the Assembly Bill 900 certification *deadline* into Assembly Bill 734. We are not persuaded. The language quoted above does not mention deadlines. The proposed amendments to Assembly Bill 734 related to adding further requirements for certification of the project such as greenhouse gas reduction targets and sustainable construction goals. As we discuss below, the Senate

21

Senate Committee on Environmental Quality unanimously passed the bill. (Sen. Judiciary Com. Analysis at pp. 2, 8.)

Like the previous Senate committee, the Senate Judiciary Committee analysis questioned whether the Howard Terminal Project should proceed as standalone legislation or be subject to the Assembly Bill 900 process. (Sen. Judiciary Com. Analysis, *supra,* at p. 13.) According to the analysis, the author contended that separate special legislation was needed because the project could not meet three important aspects of the Assembly Bill 900 process. First, "AB 900 expires in 2021, [but] for the A's project, the statute would need to be extended to 2024[,] which this bill would address." (Senate Judiciary Com. Analysis at p. 11.) Second, the author wanted residential development in the project to be at the LEED silver level, but Assembly Bill 900 required LEED gold status across the board. (Sen. Judiciary Com. Analysis at p. 13.) Finally, the author asserted that the CARB methodology for calculating net new emissions would not work for the project site. (*Ibid.*) Despite the agreed-upon amendments to the bill, the Judiciary Committee analysis suggested that the Committee might wish to consider whether the Assembly Bill 900 process was the more appropriate vehicle for the project. (Sen. Judiciary Com. Analysis at p. 13.) In response to the author's concern that the project could not meet the expiring deadlines for Assembly Bill 900, the committee analysis suggested that "the AB 900 framework, which will sunset on January 1, 2021, could be extended specifically for this project."

---

Judiciary Committee was well aware that special legislation was being sought, in part, because the Howard Terminal Project could not be completed within the expiring Assembly Bill 900 timeframe. Thus, it is more likely that the author was agreeing to strengthen the substantive certification elements in Assembly Bill 734 rather than importing the Assembly Bill 900 certification deadline to the project.

(Sen. Judiciary Com. Analysis at p. 13.)  On June 26, 2018, the Judiciary Committee concluded that the bill should be approved as amended by a vote of five to one.

A new version of proposed section 21168.6.7 was subsequently drafted, incorporating the three amendments discussed above.  (Assem. Bill 734, as amended July 3, 2018.)  The revised draft included the requirement for net zero greenhouse gas emissions as determined by CARB.  (See *id.*, § 2 [§ 21168.6.7, proposed subd. (a)(3)(A)((ii)].)  Certain amendments exceeded the agreement by requiring that all residential structures in the project achieve at least a LEED gold rating or be a GreenPoint gold rated new home.  (*Ibid.* [§ 21168.6.7, proposed subd. (a)(3)(A)(i)].)  In addition, rather than require the Judicial Council to adopt a new rule of court to expedite judicial review of the Howard Terminal Project, the bill was amended to apply existing rules of court adopted for expedited judicial review of Assembly Bill 900 projects.  (*Ibid.* [§ 21168.6.7, proposed subd. (b)].)  Finally, rather than the Governor issuing new project-specific guidelines, the draft legislation was amended to state that the guidelines for Assembly Bill 900 would "apply to the implementation of this section."  (*Ibid.* [§ 21168.6.7, proposed subd. (d)(2)].)

The bill was again amended to add more substantive requirements for certification by the Governor, such as requiring community benefits, state recycling standards, and bird safety measures.  (Assem. Bill 734, as amended Aug. 21, 2018, § 21168.6.7 [proposed subds. (a)(4)(iii), (v) & (c)(3)-(4), (8)-(9)].)  Other amendments clarified the sustainability standards for both residential and nonresidential construction and modified the definition of greenhouse gas neutrality to include local considerations.  (*Ibid.* [§ 21168.6.7, proposed subds. (a)(4)(i), (ii), (c)(3)].)

A final version of the bill was proposed on August 28, 2018. (Assem. Bill 734, as amended Aug. 28, 2018.) Of particular relevance, the subdivision requiring application of the Assembly Bill 900 Guidelines was amended to clarify that the guidelines "apply to the implementation of this section, *to the extent those guidelines are applicable and do not conflict with specific requirements of this section.*" (*Ibid.* [§ 21168.6.7, proposed subd. (e)(2), italics added].) The legislative history does not disclose what prompted this late modification to subdivision (e)(2).

The Assembly Committee on Natural Resources analyzed the final version of the proposed legislation. It noted that the bill was "substantially equivalent to AB 900 on key requirements—including LEED gold certification, [greenhouse gas] neutrality, traffic efficiency, and construction wages"—with certain enumerated exceptions related to those substantive requirements. (Natural Resources Analysis, *supra,* at p. 6.) For example, the bill "rais[ed] the bar" with respect to greenhouse gas mitigation and clean air by requiring on-site and local greenhouse gas reduction measures and imposing specific limits on the use of offsets for the first time in a CEQA statute. (*Id.* at p. 7.) The Assembly's report recommending concurrence in the Senate amendments made similar points. (Assem. Concurrence in Sen. Amendments, report on Assem. Bill 734 (2015-2016 Reg. Sess.), as amended on August 28, 2018.) The bill in its final form was overwhelming approved by both the Senate and the Assembly. It was signed into law on September 30, 2018, becoming effective on January 1, 2019. (Stats. 2018, ch. 959, §§ 1-4)

A fair reading of this legislative history supports respondents' position that the Assembly Bill 900 deadlines were not meant to be imported into Assembly Bill 734. The initial analysis of the bill by the Senate Committee on Environmental Quality focused on the ways in which Assembly Bill 734

24

was substantively weaker than Assembly Bill 900 with respect to environmental protections and the scope of judicial review.  Both that committee and the Senate Judiciary Committee questioned whether the Howard Terminal Project should proceed as standalone legislation or be subject to the Assembly Bill 900 process.  Enforcement of a one-year certification deadline prior to the expiration of Assembly Bill 900 was never mentioned.  Indeed, the Senate Judiciary Committee analysis suggested that the Assembly Bill 900 framework, which was set to expire on January 1, 2020, "could be extended specifically for this project" in lieu of a special statute.[10]  (Sen. Judiciary Com. Analysis, at p. 13.)  It appears that the Legislature was not concerned with existing deadlines so much as bolstering substantive provisions to the proposed legislation.

The author's statements similarly reflect that the negotiations around Assembly Bill 734 related to substantive certification requirements, not a one-year deadline.  Furthermore, the author expressly acknowledged that the project could not be accomplished under the existing Assembly Bill 900 expiration date without further extension of the deadlines. (Sen. Judiciary Com. Analysis at p. 13; see *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 928 ["Where an author's statements appear to be part of the debate on the legislation and were communicated to other legislators, we can regard them as evidence of legislative intent".].)

---

[10] The Legislature initially suggested that the Assembly Bill 900 deadlines could be extended specifically for the Inglewood Project as well. However, that project was also ultimately enacted as single-project legislation with its own specified deadline for EIR certification.  (Sen. Judiciary Com., analysis of Assem. Bill No. 987 (2017-2018 Reg. Sess.) as amended on June 7, 2018, p. 14; Assem. Bill No. 987, § 2 [§ 21168.6.8, subd. (i)(1)].)

The Legislature was thus faced with a clear choice. The Howard Terminal Project could either proceed as single-project legislation with no deadlines, a different method for calculating greenhouse gas emissions, and other substantive requirements, or it could proceed under the existing Assembly Bill 900 leadership project framework with extended deadlines. The Legislature chose the former. (Stats. 2018, ch. 959, §§ 1-4; see also § 21168.6.7, subd. (a)(3)(A)(i) & (ii).) Stated differently, the bill author's three reasons for seeking special legislation under Assembly Bill 734 were accommodated and the Legislature's desire to more closely align the special statute with Assembly Bill 900's substantive and procedural requirements, to the extent applicable, were addressed.

In sum, the legislative history of Assembly Bill 734 offers no indication that the Legislature intended for the Howard Terminal Project to be bound by the statutory deadlines specific to Assembly Bill 900, and appreciable evidence points to the opposite conclusion.[11] Other indicia of legislative intent also align with this view, as we discuss below.

---

[11] We also note that Senate Bill 7 did not extend the certification deadline for the Howard Terminal Project as it did for a different project pending under Assembly Bill 900. (Sen. Bill 7, § 2.) Rather, as Senate Bill 7's legislative history reflects, the Howard Terminal Project is referenced as an existing project that is yet to be completed under standalone legislation. (See Sen. Com. on Environmental Quality, analysis of Sen. Bill 7 (2021- 2022 Reg. Sess.) as amended on Feb. 18, 2021, pp. 4-5; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill 7 (2021-2022 Reg. Sess.) as amended Feb. 18, 2021, pp. 3-5.).) The Legislature apparently does not share petitioners' view that Assembly Bill 734 has no force and effect because the Governor did not certify the project prior to January 1, 2020. Had it adopted the view that the Howard Terminal Project was subject to the Assembly Bill 900 deadlines, it seems likely that the Legislature would have extended the Assembly Bill 900 framework for the Howard Terminal Project as it had for another project. (See *Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 940 [subsequent expression of

**D. Legislative Purpose Supports this Construction of the Statute**

As noted above, we " 'must construe the statute with a view to promoting rather than defeating its general purpose and the policy behind it.' " (*Upland*, *supra*, 111 Cal.App.4th at p. 1303; see also *Berti, supra,* 39 Cal.4th at p. 379 [where language permits more than one reasonable interpretation court looks to a variety of extrinsic aids, " ' "including the ostensible objects to be achieved" ' "].)  The purposes served by enactment of Assembly Bill 734 are made clear in the first section of the legislation:  to assist the City of Oakland in retaining the Oakland Athletics by streamlining environmental review for a "state-of-the-art baseball park" project; to generate thousands of high-wage, highly skilled jobs during construction and operation of the project; to support the City's and region's goals for sustainable, transit-oriented housing, including affordable housing; to provide an opportunity for investment "in new and improved transit and transportation infrastructure"; and to "implement sustainability measures designed to improve air quality and mitigate the emissions of greenhouse gases resulting from the project." (Assem. Bill 734, § 1, subds. (b)-(f).)  For all these reasons, the special legislation was deemed necessary so that the Howard Terminal Project could be developed in an "expeditious manner." (*Id.*, § 3.)

The author of Assembly Bill 734 emphasized that the special legislation was necessary because it is "critically important to the [C]ity and the entire East Bay region to retain a professional sports team."  Given these concerns, the special statute "would help provide certainty to the [C]ity and the Oakland A's who have made a public commitment to staying in Oakland."

---

legislative intent is not binding but is a factor that may be considered when construing an earlier enacted statute].)

27

(Environmental Quality Analysis, *supra*, at p. 7; Sen. Judiciary Com. Analysis, *supra*, at p. 8.) The author reported that a June 2017 study by the Bay Area Council Economic Institute "estimated that a new ballpark would generate $3.05 billion of economic impact for the residents and businesses of the City of Oakland over the first ten years of operation." (Environmental Quality Analysis, at p. 7; Sen. Judiciary Com. Analysis, at p. 8.)

In light of the significant environmental, economic, and cultural benefits which prompted the adoption of Assembly Bill 734, petitioners' reading of the statute would undermine rather than promote the general purposes of the statute and the objectives to be achieved. Petitioners would essentially make the special legislation a nullity because the Governor failed to certify the project by January 1, 2020, a deadline never mentioned in the statutory text and one which the bill author suggests could never be met. Even if we ignore the author's own statements, other evidence in the record supports the practical understanding that a one-year deadline was never contemplated by this legislation.

The Howard Terminal Project includes a baseball stadium, adjacent residential, retail, commercial, cultural, entertainment, or recreational uses, associated open spaces, and related infrastructure. (§ 21168.6.7, subd. (a)(3).) Certification of the project for streamlined environmental treatment required a determination that the project met new standards for achieving greenhouse gas neutrality. (§ 21168.6.7, subd. (a)(3).) It took CARB 16 months to issue its determination that the Howard Terminal Project "will meet the [greenhouse gas] requirements provided by AB 734." The Governor could not certify the project prior to CARB's determination. (§ 281168.6.7, subds. (a)(3)(ii), (d)(3).). Petitioners would have this Court conclude that the Legislature, after engaging in months of negotiation and amendments,

28

enacted comprehensive single-project legislation that was doomed from its inception because CARB's step in the process would alone exceed the one-year deadline for certification. We find such a construction inimical to the underlying purposes of Assembly Bill 734.

Finally, we are mindful that statutes must be interpreted " 'so as to give a reasonable and common-sense construction . . . [,] a construction that is practical rather than technical, and will lead to wise policy rather than mischief or absurdity.' " (*Upland*, *supra*, 111 Cal.App.4th at p. 1303.) Here, both parties argue that the existence of the express deadline for certifying an EIR for the Inglewood Project in Assembly Bill 987—the special legislation which was enacted concurrently with Assembly Bill 734—supports their reading of section 21168.6.7. According to respondents, since the author of Assembly Bill 734 made clear that the Assembly Bill 900 timelines would not work for the Howard Terminal Project and had to be aware that Assembly Bill 987 legislated its own specific January 25, 2025 deadline, the absence of any deadline from section 21168.6.7 must be deliberate and confirms that no deadlines apply to the project. Petitioners, on the other hand, assert that since the deadline for EIR approval by a lead agency was specifically extended for the Inglewood Project, the Legislature must have understood that the Assembly Bill 900 deadlines would otherwise have applied. Thus, the Legislature's failure to include any deadlines in Assembly Bill 734 reflects the Legislature's intent to make the Howard Terminal Project subject to the Assembly Bill 900 deadlines.

Both arguments are reasonable. However, from a *practical* point of view, we find it difficult to believe that the author of Assembly Bill 734— having gotten the special legislation he sought and being cognizant of the 2025 deadline granted by the Legislature for the Inglewood Project—would

29

not have included an express deadline in section 21168.6.7 if he believed the Assembly Bill 900 deadlines to be binding on the Howard Terminal project, essentially making expedited environmental review of the project infeasible. The author stated that the Howard Terminal Project needed a 2024 deadline, "which the special legislation would address." (Sen. Judiciary Com. Analysis at p. 11.) Respondents argue that Assembly Bill 734 *did* address this issue by deliberately omitting any deadlines from the statutory text.[12] We find this argument more persuasive than petitioners' contention that the Legislature rejected the author's proposed extension of the deadlines by making reference to the Guidelines.

For these reasons, we conclude that the "more reasonable" interpretation of subdivision (e)(2) is that the deadlines mentioned in the Guidelines were not incorporated into section 21168.6.7 because they were not applicable to the Howard Terminal Project. Rather, pursuant to its express language, there are no deadlines in the special statute, for certification by the Governor or otherwise. We therefore agree with the trial court that the Governor was authorized to certify the project on February 11, 2021.

---

[12] The Inglewood Project addressed its own unique timing issue, that the lease for the Los Angeles Clippers to play at the Staples Center will expire at the end of 2024, by providing that Assembly Bill 987 will be repealed as of January 1, 2025 if the lead agency fails to certify the EIR before that date. (§ 21168.6.8, subd. (i)(1); see also Assem. Com. on Natural Resources, analysis of Assem. Bill No. 987 (2017–2018 Reg. Sess.) as amended on August 27, 2018, pp. 4, 7-8.).) Respondents' point, that Assembly Bills 734 and 987 are not extensions of the Assembly Bill 900 framework but are instead standalone legislation that address the unique time constraints of each project, is well taken.

## III. DISPOSITION

The judgment is affirmed.  Respondents are entitled to their costs on appeal.

_____

                    SANCHEZ, J.


We concur.


_____

HUMES,  P.J.


_____

MARGULIES, J.


(A162001)

Alameda County Superior Court

Honorable Noel Wise

Pillsbury Winthrop Shaw Pittman, Ronald E. Van Buskirk, Stacey Wright, Kevin M. Fong; Pacific Merchant Shipping Association, Michael Jacob; Chauvel & Glatt, Ronald C. Chauvel and Derek O. Meyers for Plaintiffs and Appellants.

Matthew Rodriquez, Acting Attorney General of California; Mark R. Beckington, Supervising Deputy Attorney General; Seth E. Goldstein and R. Matthew Wise, Deputy Attorneys General for Defendant and Respondent Gavin Newsom

Barbara J. Parker, Oakland City Attorney; Maria S. Bee, Chief Assistant City Attorney; Bijal Patel, Special Counsel, Land use and Real Estate Units; Meyers Nave, Timothy Cremin, and Shaye Diveley for Defendant and Respondent City of Oakland.

Gibson, Dunn & Crutcher, Daniel M. Kolkey, Mary G. Murphy, Matthew S. Kahn, Michael Holecek, Elizabeth A. Dooley; Remy Moose Manley, Whitman F. Manley, Christopher L. Stiles and D'Lonra Ellis for Real Party in Interest and Respondent.